STRATTON GRAIN COMPANY, a corporation, Plaintiff,

v.

GEORGE REISIMER, and Joseph J. O'Day, Executor of the Will of Frank J. Kuhl, Deceased, Defendants.

Civ. A. No. 55–C–2.

United States District Court
E. D. Wisconsin.

July 8, 1958.

Bernard V. Brady, J. T. Harrington and E. J. Zarwell, Milwaukee, Wis., for plaintiff.

Edward G. Minor, U. S. Atty., Francis L. McElligott, Asst. U. S. Atty., Milwaukee, Wis., Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe and David W. Richter, Dept. of Justice, Washington, D. C., for defendant.

TEHAN, Circuit Judge.

The plaintiff, Stratton Grain Company, a Delaware corporation, with its principal office in Milwaukee, Wisconsin, is suing for the recovery of an excess profits tax and interest in the total sum of $144,986.25, plus statutory interest thereon, paid by it for the fiscal years ending May 31, 1942 through May 31, 1946. All facts, including jurisdiction, have been completely stipulated by the parties.

In 1935, the plaintiff was incorporated in a nontaxable reorganization under Section 112(b) (4) of the Internal Revenue Act of 1934, 26 U.S.C.A. § 112(b) (4), at which time it took over the assets of several corporations valued at $1,882,000.85. In consideration for these assets it issued fully paid and non-assessable 10,000 shares of its non-par common capital stock with a stated value of $100 per share, amounting to a million dollars. The remainder of the predecessor corporations' asset value, that is, the sum of $882,000.85 was

treated by the plaintiff as capital or paid in surplus. The undistributed accumulated earnings and profits of the merged corporations, not including the plaintiff, totalled $874,323.09 at the date of the reorganization. The plaintiff never reflected on its books nor treated any part of these undistributed earnings and profits as its own earnings and profits. On the contrary, on its books, the plaintiff, at the date of the reorganization and at all times since, has treated these undistributed earnings and profits as its capital surplus. The results of its own operations subsequent to the reorganization have been reflected in an earned surplus account distinct from the capital paid-in surplus account. However, due to operating losses subsequent to the reorganization and during the pertinent years 1942 to 1946, the plaintiff's books revealed an operating deficit.

During the years in question, the plaintiff filed its excess profits tax returns using the invested capital method rather than the average earnings method. In doing so, it was necessary to compute a figure called "Equity invested capital," the ingredients of which are described in Section 718 of the Excess Profits Tax Act of 1940. 26 U.S.C.A. Section 718. The plaintiff in computing this figure showed as property paid in the amount of $1,889,381.49 or the aggregate total of its capital, capital surplus, and earned surplus at the date of the reorganization and merger. However, its computation did not include as a part of its total sum any amount at all pursuant to Section 718(a) (4) of the Code as *accumulated earnings and profits* since it did not consider the earnings and profits of the predecessor corporations as its own earnings and profits, and it itself had been losing money since the merger. Neither for the same reason did it make any reduction pursuant to Section 718(b) (3) of the Code which requires the subtraction of the "earnings and profits of another corporation which previously at any time were included in accumulated earnings and profits by reason of" a nontaxable transaction such as the plaintiff went through in 1935. Hence, its "Equity invested capital" was figured by the plaintiff to be $1,889,381.49 for all the years in question.

In May of 1949 the Commissioner of Internal Revenue made deficiency assessments against the plaintiff, to the extent of $144,986.25, resulting from his determination that the accumulated, undistributed earnings and profits of the predecessor corporations amounting to $874,323.09 for each of the years 1942 to 1946 represented " * * * earnings and profits of another corporation which previously * * * were included in * * * earnings and profits * * * " of the plaintiff within the meaning of Section 718(b) (3) of the Code. Accordingly in each of those years the Commissioner deducted the sum of $874,323.09 in computing the plaintiff's "Equity invested capital." He also made an additive adjustment in the total "Equity invested capital" pursuant to Section 718(a) (4) of the Code. Because of the plaintiff's losses during the years the net result was to reduce substantially the "Equity invested capital" and thereby require a higher tax payment from the plaintiff.

The plaintiff paid the deficiency assessments and thereafter filed timely claims for refund which were wholly disallowed by the Commissioner, whereupon this action was timely brought.

The issue presented by the undisputed facts is this: Must the accumulated earnings and profits yet undistributed of the predecessor corporations be treated as the accumulated earnings and profits of the successor corporation, the plaintiff taxpayer, within the meaning of the Excess Profits Act of 1940 as amended, more particularly Section 718(a) and Section 718(b) (3), even though the plaintiff never so treated them?

Preliminarily certain observations should be made as to the general pur-

pose and intent of Congress in enacting the Excess Profits Tax Act.

In 1940 a state of war existed between certain European nations which threatened to and did become of world wide proportions. We as a nation were engaged in a monumental effort to build our national defenses in order to beat back any and every potential attack. The primary purpose of the Act, of course, was to raise the funds to finance the defense effort. But it clearly appears that the Congress was equally concerned that the burdens of our defense efforts fall as fairly as possible on all persons. The steeply graduated tax provisions of the Act reflect the determined purpose of Congress to prevent the substantial enrichment of already wealthy persons and corporations. We think the Act can fairly be read as reflecting a policy that abnormally high profits should be practically confiscated in times of grave national emergency while normal profits should be allowed and encouraged.

To implement this policy two alternative credits were allowed to corporations before the excess profits tax would begin to take effect:

1. A credit based on historical profits on the theory that a profit realized over a space of normal years would of necessity be a normal profit; or alternatively,

2. A credit based on the investment made to obtain the profit, which investment would, of course, include retained earnings.

This latter credit, referred to in the statutes as Equity invested capital, was the one chosen and used by the taxpayer and now forms the basis of this action.

In respect of this investment capital credit method, it can be broadly but fairly said that what constitutes ordinary or normal earnings of a corporation is determined by the percentage that earnings bore to invested capital during the base period years. This percentage is then applied to the earnings in the taxable year. The amount in excess of such normal earnings constitutes ex-

cess profits and is subject to tax. It is obvious that the greater the sum that can be established as equity invested capital in any given year, the greater will be the sum of normal ordinary earnings which are not subject to the tax. It also follows that the total amount of excess profits tax so imposed will be the lower.

In respect to 1942, which year the parties have agreed was typical of the years in issue, the taxpayer plaintiff earnestly asserts that under the stipulated facts, the relevant statutes and the applicable case law, it must be held that it is entitled to a credit on equity invested capital of $1,889,381.49. With equal earnestness the defendant claims the fact and the law permit the allowance of only $1,386,037.74, as the basis for such credit.

A better understanding of the essential points of difference between the parties that brought about such a substantial disparity can be had if an examination is made of the applicable statutes, the computations each party made thereunder, and the legal justification for the approach and treatment each employed in so doing.

The law applicable to this issue follows:

"§ 718. Equity invested capital.

"(a) Definition. The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

"(1) Money paid in. * * *

"(2) Property paid in. * * *

"(3) Distributions in stock. * * *

"(4) *Earnings and profits at beginning of year. The accumulated earnings and profits as of the beginning of such taxable year;* [*under scoring ours*]

* * * * *

"(b) Reduction in equity invested capital. The amount by

which the equity invested capital for any day shall be reduced as provided in subsection (a) shall be the sum of the following amounts—

"(1) Distributions in previous years. Distributions made prior to such taxable year which were not out of accumulated earnings and profits;

"(2) Distributions during the year. Distributions previously made during such taxable year which are not out of the earnings and profits of such taxable year;

"(3) *Earnings and profits of another corporation. The earnings and profits of another corporation which previously at any time were included in accumulated earnings and profits by reason of a transaction described in section 112(b) to (e)* [I.R.C.1939], both inclusive, or in the corresponding provision of a prior revenue law, or by reason of the transfer by such other corporation to the taxpayer of property the basis of which in the hands of the taxpayer is or was determined with reference to its basis in the hands of such other corporation, or would have been so determined if the property had been other than money; and [*underscoring* ours] * * *."

In respect of the foregoing statutes, it should be observed that the *underscored* subsection appearing under Section 718(a) will sometimes hereinafter be referred to as an additive factor, and the one appearing under Section 718(b) as a subtractive factor.

It has been stipulated by the parties for the purpose of illustration of a typical year, that taxpayer made the following computations for the fiscal year ending May 31, 1942:

| | | |
|---|---|---|
| "1. | Property paid in (including predecessors' earnings designated as 'paid in surplus') | $1,889,381.49 |
| "2. | Accumulated earnings and profits | –0– |
| "3. | Total | $1,889,381.49 |
| "4. | Less: Earnings and profits deducted under Section 718 (b) (3) | –0– |
| "5. | Equity invested capital | $1,889,381.49" |

———◆———

There is no controversy about the entry in Line 1. It is stipulated that the sum of $1,889,381.49 included taxpayer's capital, capital surplus and earned surplus. The entries of zero however in Line 2 (representing the additive step of Section 718(a) (4)) and Line 4 (the subtractive step of Section 718(b) (3)), involve the matters of issue here.

It is the position of the taxpayer that neither of these additional steps is authorized under the facts of this case, since, (1) the legislative intent of Congress in enacting Section 718(a) (4) and Section 718(b) (3) was to prevent the use of a double additive factor in the computation of equity invested capital, a condition not here present, (2) the earnings and profits of taxpayer's predecessors were not included in taxpayer's earnings and profits at any time and never became earnings and profits of the taxpayer, and, (3) taxpayer's computation is the only one consistent with the policy of tax compatibility.

In its argument that Section 718(b) (3) has applicability only when duplica-

tion is present, i. e., when a taxpayer has included accumulated earnings and profits once as property paid in and a second time as part of its own accumulated earnings and profits at the beginning of the year, the taxpayer refers us to certain provisions of The Second Revenue Bill of 1940, H.R. 10413, which subsequently in conference became Section 718(b) (3) of the conference bill passed by Congress.

Section 718(c) (4) read as follows:

"(c) (4) Earnings and Profits of Transferor Corporations. For the purposes of subsection (a) (4) the accumulated earnings and profits of the corporation shall be determined without the inclusion of any of the earnings and profits of a transferor corporation which would otherwise be included by reason of property of such transferor having been paid in for shares of, or as a contribution to the capital of, or as paid-in surplus of, the transferee corporation."

In explanation of this the Committee on Ways and Means stated in part in its report accompanying H.R. 10413:

"Under various provisions of the Internal Revenue Code dealing with exchanges and liquidations, the transfer of the property by a corporation to another corporation results in the nonrecognition, in whole or in part, of the gain or loss realized by the transferor upon such transfer. In such cases well established principles of income tax law require that the earnings and profits of the transferor shall go over to the transferee and shall be considered to be earnings and profits of the transferee for tax purposes. Subsection (c) (4) of Section 718 provides that such transferred earnings and profits shall not be taken into account in computing the earnings and profits as of the beginning of the taxable year for the purpose of determining the equity invested capital. Inasmuch as the property

received by the transferee upon such a transfer is included in such cases in the equity invested capital at its adjusted basis in the hands of the transferor, it is necessary to exclude the earnings and profits acquired by the transferee by reason of such transfer in order to avoid duplication." Rep. of Committee on Ways and Means. H.R.Rep. No. 2894—76th Cong. 3rd Sess. 25 (1940); 1940—2 C.B. 496, 514.

Prior to submission to conference, Section 718(c) (4) was deleted by the Senate Committee and replaced with Section 718(b) (3). The Senate Finance Committee at that time commenting on this change said:

"Your committee has made no change in the determination of equity invested capital except to clarify the provisions which were designed to avoid any overstatement of invested capital as the result of duplicating amounts in the items of earnings and profits and property paid in. Such a duplication might otherwise arise in the computation of invested capital in cases of reorganization and other tax-free exchanges." Rep. of the Committee on Finance, Sen.Rep. No. 2114, 76th Cong., 3rd Sess. 6 (1940); 1940—2 C.B. 528, 532.

The same report further stated: (Sen. Rep. p. 14, 1940—2 C.B. 539)

"This section is substantially as it was in the House bill except for certain clerical and technical changes. The most important of these are as follows:

"(1) Section 718(c) (4) of the House bill provided that, in making the computations required by subsections (a) and (b), the earnings and profits of a transferee corporation were not to include the earnings and profits of another corporation which would otherwise be included by reason of property of such other corporation having been paid in for stock, or as a contribution to capi-

tal, or as paid-in surplus, of the transferee corporation. This subsection has been inserted as section 718(b) (3) and made an actual step in the computation."

It is argued by plaintiff taxpayer that thus the statute has no application to, nor does it attempt to reach situations wherein, as here, predecessor's earnings and profits are not taken by the successor as earnings and profits for (1) no duplication exists and (2) the statutory language excludes the additional two step—addition and subtraction. The forerunner of the present sections, it maintains, dealt only with those cases where the predecessor's earnings and profits were taken by the successor as a capital item and excluded the predecessor's earnings and profits from computations concerning the successor's earnings and profits. The changed form "substantially as it was except for clerical and technical changes" deals with the converse and says the same thing. Taxpayer contends that instead of the negative, namely, If predecessor's earnings and profits are taken as capital items then they shall not enter into the successor's computation of successor earnings and profits; the sections as finally enacted state: If a successor takes earnings and profits from predecessor as earnings and profits of the successor and not as capital items, then the successor shall treat those earnings and profits in the manner prescribed so as to eliminate a possible duplication. Read thus, the forerunner of the present sections and the present section become the same "except for clerical and technical changes."

If, however, it urges, the present section is construed to require a subtraction in the amount of predecessor's earnings and profits regardless of the manner in which such former earnings and profits exist in the successor, then a major difference in substance is created by judicial fiat in a field where Congress clearly intended only a clerical and technical change.

Secondly and in further justification of its treatment of entering zeroes or blanks in Lines 2 and 4 of its return, the taxpayer maintains that there were no accumulated earnings or profits of a predecessor corporation to set out since in truth and in fact, said earnings and profits had never been included in the accumulated earnings and profits of the taxpayer corporation.

It is a stipulated fact that the plaintiff taxpayer did not at any time reflect on its books any part of these earnings and profits of predecessor corporation as its own earnings and profits, nor has it ever distributed to its stockholders any dividends from these earnings. It is urged that the language "earnings and profits of another corporation which previously at any time were included in accumulated earnings and profits by reason of a transaction described in section 112(b) to (e)" (tax free reorganization provision) requires that the plaintiff must have included by its own act the merged corporation's earnings in its own accumulated earnings and profits to come within the purview of the statute since the expression "by reason of" in that phrase predicates that the act of inclusion must be after the reorganization transaction.

This argument is directed primarily to the fourth or subtractive item covered by Section 718(b) (3). While certain of it does apply to Section 718 (a) (4), the additive factor, the taxpayer's direct argument in respect to its answers of "blank" or "zero" is that from its very inception it never experienced any earnings or profits. As a matter of fact its accumulated earnings and profits revealed an operating deficit of $503,343.75 for the year ending 1942. Under Treasury Regulation 112, Section 35.718–2(a) relating to excess profits tax for taxable years beginning after December 31, 1941, such operating deficit need not be taken into account in determining invested capital but can be considered as zero.

The said regulation states in pertinent part:

"* * * If there is a deficit in the accumulated earnings and profits as of the beginning of the taxable year, such deficit shall not be taken into account in determining invested capital, and in such cases the earnings and profits as of the beginning of the taxable year shall be considered as zero, but subsequent earnings and profits shall be applied against such deficit. * *" See, also, similar comment made in H.R. Rep. No. 2894—76th Cong. 3rd Sess. 25 (1940)

Nor, contends the taxpayer, can or should this construction of the express language of the statute be subverted by holding that the doctrine of Commissioner of Internal Revenue v. Sansome, 2 Cir., 1932, 60 F.2d 931, requires as a matter of law that accumulated earnings and profits of a predecessor corporation become the accumulated earnings and profits of the taxpayer corporation by operation of law judicially imposed. The taxpayer conceded that if, as, and when it declares dividends to its stockholders they will be taxable as distributions of earnings rather than capital to the extent thereof. In substance, however, it maintains that the holding of Commissioner of Internal Revenue v. Phipps, 1949, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771 completely rejects the previously underlying concept of continuity of venture between the old and new corporations, and hence the accumulated earnings and profits of the predecessor corporation become the accumulated earnings and profits of the taxpayer corporation only when it, by its own act, treats them as such for the purposes of making a distribution.

Third and finally, the taxpayer maintains that the computation made by the taxpayer is the only method by which effect can be given to the policy of the Excess Profits Tax Act as construed by the courts, of securing corporate tax compatibility, i. e., compatibility between the income tax of a corporation and the excess profits tax of the same corporation. It claims that this is not only possible but logical and gives purpose to the many cases using the categorical phrase "for all tax purposes", the only qualification necessary being that the statement "all tax purposes" be applied to the single corporate entity. This, it claims, is in contradistinction to the contention of the Commissioner of Internal Revenue, which attempts to reconcile the three-fold tax problems of distributee income tax, corporate income tax, and corporate excess profits tax. Taxpayer maintains that the Sansome doctrine does not attempt to accelerate recognition of gains whose recognition for corporate tax purposes is specifically deferred, but rather recognizes that income to a distributee of a corporate entity is an entirely different matter than gain or loss, recognized or not recognized, to the corporation, and taxes such distributions as income to distributees regardless of the actual profit structure of the distributing corporation, so long as the "earnings and profits" which existed prior to a tax free reorganization have not been offset by recognized losses or taxable distributions. Taxpayer argues that this doctrine fully accomplishes a uniform treatment of distributee income for it maintains the fund for payment of distributee income after such fund is once established. An extension of this Sansome distributee tax doctrine to the field of corporate income and excess profits tax, as contended for by the Commissioner of Internal Revenue, however, burdens the doctrine with the task of reconciling the irreconcilable. That is, in the language of the plaintiff's brief, it must reconcile the deferred recognition provisions of the corporate income tax law with the established fund provisions of the distributee income tax case law and the provisions of the corporate excess profits tax law, in direct violation of the tax-free reorganization provisions of Section 112(b) to (e) I.R.C., by aggregating and recognizing the former earnings and profits of corporations participating in such mergers at the time of such tax-free merger.

Taxpayer maintains that in truth and in fact, the policy established by the courts is to maintain tax compatibility in each tax entity and cites to that effect the following cases: Commissioner of Internal Revenue v. South Texas Lumber Co., 1948, 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831; May, Stern & Co. v. Commissioner, 3 Cir., 1950, 181 F.2d 407; Capital National Bank of Sacramento v. Commissioner, 1951, 16 T.C. 1202; and Butter-Nut Baking Company v. Commissioner, 1944, 3 T.C. 423, as holding that the criterion for recognition of gain or loss with respect to corporate excess profits tax is the recognition or non-recognition of such gain or loss for corporate income tax purposes. It follows, taxpayer argues, that thus the fields are entirely separate and distinct and distributee income tax construction cases are not in point.

We shall now take up the method of computation used by the Commissioner of Internal Revenue and the reasoning and authority that lead him to a finding of equity invested capital of more than a half-million dollars less than the taxpayer, found in the illustrative year of 1942.

It has also been stipulated for the purpose of illustration how the Government made its computation for the fiscal year ending May 31, 1942:

| "1. | Property paid in (including Predecessor's earnings) | $1,889,381.49 |
|---|---|---|
| "2. | Accumulated earnings and profits ($874,323.09 less deficits) | 370,979.34 |
| "3. | Total | 2,260,360.83 |
| "4. | Less: Earnings and profits deducted under Section 718 (b) (3) | 874,323.09 |
| "5. | Equity invested capital | $1,386,037.74" |

It will be observed that there is no dispute as to the amount to be inserted in Line 1, both parties having recorded the sum of $1,889,381.49. However in Line 2, under "Accumulated earnings and profits", the Commissioner, beginning with the accumulated earnings and profits of the prior corporation in the sum of $874,323.09, subtracts the operating deficit of $503,343.75 to arrive at the additive sum of $370,979.34.

Before we go into the justification urged upon us by the Commissioner in support of the above computation it may be helpful to point out the essential differences between the two computations: By setting up accumulated earnings and profits as a matter of law under the purported teaching of the Sansome case, the Commissioner brought into effect as a substantive factor the operating deficit of $503,343.75, thus depriving the plaintiff of the privilege given to corporations having a deficit in accumulated earnings and profits of not having to have said deficit taken into account.

Treasury Regulation 112, Section 35.718–2(a) (165 F.Supp. 921).

It is urged that the reason that a deficit corporation was not required to go below the zero point was the recognition that an investment once made remains the producing factor of income, and that the taxpayer is entitled to seek recoupment in future years.

Substantially the position of the Commissioner of Internal Revenue in making his foregoing computation may be simply put thus: It being conceded in this case that the tax free reorganization, under Section 112(b) (4) in 1935 of which taxpayer was the surviving corporation, was a transaction of the character described in the Section 718 (b) (3), the rule of the Sansome and Crossett Western Co. v. Commissioner, 3 Cir., 1946, 155 F.2d 433, certiorari denied 329 U.S. 729, 67 S.Ct. 84, 91 L.Ed. 631, cases holding that the earnings and profits of the original corporations become the earnings and profits of the surviving corporation requires the treatment given in Lines 2 and 4 of the Commissioner's computation.

While the Commissioner relies on these authorities, in reality it is the extent of the rule of the Sansome case that is basic here since the holding in Crossett is premised on it.

Our first and also decisive question is: Has the Sansome rule been so substantially limited in scope and rationale by Commissioner of Internal Revenue v. Phipps, 1949, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771, that it cannot now be held to be authority to support and justify the determination of the Commissioner that as a matter of law the accumulated earnings and profits of predecessor corporations became and were the accumulated earnings and profits of the successor corporation even though they had never been so treated?

Our analysis of the pertinent law leads us to agree with the plaintiff that it has.

Any study of the Sansome rule begins naturally enough with the celebrated and oft-cited decision of Judge Learned Hand of the Court of Appeals for the Second Circuit, filed July 26, 1932, entitled Commissioner of Internal Revenue v. Sansome, 60 F.2d 931. The facts involved in that case reveal that Sansome, the taxpayer, on January 1, 1921, bought some shares of stock having $100 par value in a New Jersey Company, which on April 1, 1921 sold all of its assets to another company of the same state. The new company assumed all existing liabilities and issued its shares to the stockholders of the old, without change in the proportion of their holdings. The only difference appears to be that the charter of the new corporation gave it slightly broader powers. At the time of the reorganization the old company had on its books a large surplus and undivided profits. The new corporation made no profit and the company was dissolved in 1923. During 1923, Sansome received payment upon his shares in liquidation which the Commissioner included in his returns as dividends for the year 1923, for the distribution of that year did not exhaust the surplus and undivided profits which still remained. Sansome protested, wishing to use these dividends to compute the gain upon his investment, that is, to take all liquidating dividends first to amortize his cost or base, and return any overplus as profit in the year 1924, when the last payment was made. The board of Tax Appeals vacated a deficiency assessed by the Commissioner against the taxpayer upon income tax for the year 1923, holding that as the companies were separate juristic persons the latter one had distributed nothing out of *its* earnings or profits. Proceedings were thereupon brought by the Commissioner to review that order. Judge Hand, speaking for the Court of Appeals for the Second Circuit, agreed with the Commissioner and held that since the reorganization was nontaxable under Paragraph 202(c) (2) of the Revenue Act of 1921, the accumulated earnings and profits of the transferor retained their character as such for tax purposes in the hands of the transferee and were consequently taxable on distribution as ordinary income under Paragraph 201 of the same Act. The decision of Judge Hand is based on a theory of continued corporate venture.

"Hence we hold that a corporate reorganization which results in no

'gain or loss' under section 202 (c) (2) (42 Stat. 230) does not toll the company's life as continued venture under section 201, and that what were 'earnings and profits' of the original, or subsidiary, company remain, for purposes of distribution, 'earnings or profits' of the successor, or parent, in liquidation. As the transaction—'reorganization'—between the companies at bar fell plainly within section 202(c) (2), it seems to us that the Board was wrong." 60 F. 2d 933.

Thereafter, various federal court decisions, among which was the Crossett case, used this continuity of venture theory in treating a predecessor corporation's earnings and profits as being earnings and profits of the successor corporation after a Section 112 transfer had occurred. This would appear to be justified and logical so long as the continuity of the corporate business or venture theory obtained. Such was the state of the law at the time that the revenue agent's report in this case was rendered.

In 1947, however, the Phipps case arose to test whether such earnings and profits of a predecessor corporation were to be considered those of the successor corporation for all tax purposes on all tax questions. In the Phipps case (1947, 8 T.C. 190) the relevant facts as stipulated and found by the Tax Court, are as follows: In December, 1936, Nevada-California Electric Corporation liquidated five of its wholly owned subsidiaries by distributing to itself all of their assets subject to their liabilities, and by retaining and cancelling all of their outstanding stock. No gain or loss on the liquidation was recognized for income tax purposes under Paragraph 112(b) (6) of the Revenue Act of 1936. On the date of liquidation one of its subsidiaries had earnings and profits accumulated after February 28, 1913 in the amount of $90,362.77. The other four had deficits which aggregated $3,147,803.62. On December 31, 1936, the parent had earnings and profits accumulated after February 28, 1913 in the amount of $2,129,957.81 which amount does not reflect the earnings or deficits of the subsidiaries. In 1937, Nevada-California had earnings of $390,387.02. In the years 1918 to 1933 inclusive, the parent and subsidiaries filed consolidated income tax returns.

The respondent, Phipps, was the owner of 2640 shares of the preferred stock of Nevada-California. During 1937, that corporation made a pro rata cash distribution to its preferred stockholders in the amount of $802,284, of which the respondent received $18,480. The Commissioner determined that the distribution was a dividend under Paragraph 115(a) (2) of the Revenue Act of 1936, 26 U.S.C.A. § 115(a) (2), and constituted ordinary income in its entirety. While the proceeding was before the Tax Court, the respondent Phipps conceded that 49% was properly chargeable to earnings and profits of the taxable year. The Tax Court held in her favor that the balance was not a taxable dividend out of earnings and profits on the theory that all of Nevada-California's accumulated earnings and profits, plus the accumulated earnings and profits of the subsidiary that had a surplus, were erased by the aggregate deficits of the other four subsidiaries. In arriving at this result, the Tax Court followed the Sansome continuation of venture theory, that is, that the earnings of the predecessor were to be considered the earnings of the successor for all tax purposes, and on all tax questions and consequently the offsetting of the deficit in taking over a reorganization had to be recognized because no sound reason existed under the continuation of venture theory for differentiating between earnings and deficits. (8 T.C. 196) The Commissioner then appealed to the Court of Appeals for the Tenth Circuit, and the majority of that Court applied the continuation of venture theory as being the basis of the Sansome rule, holding that in a tax free reorganization of corporations, the en-

tire corporate life survives as a continued venture insofar as tax consequences are concerned.

Judge Huxman of that court, however, dissented. He observed that both parties agreed that the decision was controlled by the so-called "Sansome rule", but that the parties to the litigation as well as the court were unable to agree upon the interpretation of the Sansome case. It was his opinion that the so-called continued venture theory had nothing to do with the question, and that all the Sansome case decided was that when earnings of a predecessor were taken over in a tax-free reorganization and were later distributed they would be considered a distribution of earnings and profits of the distributing corporation.

He stated that the oneness of the old and the new corporations continued only for that purpose and not for "all purposes" and that the reason for the rule was to prevent tax free distributions of earnings. He expressed this in the following language: (167 F.2d 120)

> "But it does not follow that this oneness of identity continues for all purposes. The reason for the rule is to prevent, in a tax-free transfer of all of the assets of a subsidiary, a distribution of accumulated earnings, available for dividends subject to income tax in the subsidiary's hands, from becoming capital in the hands of the Parent and thus escaping taxation as income when distributed by the Parent.

> "When the reason for this rule ceases, it no longer has application and the separateness of corporate entity even between a Parent and its subsidiaries applies. * * *"

The Supreme Court of the United States then brought the Phipps case before it on writ of certiorari (1949, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771). The Supreme Court recognized that the decisions of the federal courts had frequently taken the "continued venture" theory as the basis of the Sansome rule (310 U.S. at page 416, 69 S.Ct. at page 619), but concluded that the Tax Court and the majority opinion in the Circuit Court of Appeals were wrong in deciding that the principle of the Sansome case was that profits of a predecessor taken over under a Section 112(b) to (e) transfer were to be treated as profits of the successor for all tax purposes whether because of or irrespective of any supposed continuity of the business or venture, but, on the contrary, that the principle on which the Sansome case rested was that of preventing tax-free distribution of profits taken over in a tax-free transfer under Section 112(b) to (e); and that this was solely for the purpose of preventing corporate earnings from escaping taxation by means of Section 112(b) to (e), which section was intended only to defer not to permit the escape from taxation of the distribution of such earnings.

The highest court stated in conclusion:

> "We conclude from the cases that the Sansome rule is grounded not on a theory of continuity of the corporate enterprise but on the necessity to prevent escape of earnings and profits from taxation." 336 U.S. at page 417, 69 S.Ct. at page 620.

> "If the assets of the parent and subsidiary are combined via a tax-free reorganization or liquidation, the effect of the Sansome rule is simply this: a distribution of assets that would have been taxable as dividends absent the reorganization or liquidation does not lose that character by virtue of the tax-free transaction." 336 U.S. at page 420, 69 S.Ct. at page 621.

Again:

> "Congress has expressed its purpose to tax all stockholders who receive distributions of earnings and profits. In order to facilitate simplification of corporate financial structures, it has further provided that certain intercorporate transactions shall be free of immediate tax conse-

quences to the corporations. There has been judicially superimposed by the Sansome rule, with the subsequent explicit ratification of Congress, the doctrine that tax-free reorganizations shall not disturb the status of earnings and profits otherwise available for distribution. Nevada-California at the time of the 1937 distribution to respondent had such earnings and profits. Since we believe that to allow deduction from these earnings of the deficits of its subsidiaries would be in effect to recognize losses the tax effects of which Congress has explicitly provided should be deferred, the judgment of the Court of Appeals is reversed." 336 U.S. at page 421, 69 S.Ct. at page 621.

The Phipps case as we read it, and so far as seems relevant here, teaches first that the Sansome rule has been sharply limited to but one purpose—that of preventing a tax-free distribution of a predecessor's earnings and profits, and second, that the Sansome rule does not provide for the acceleration of the recognition of gains, whose recognition for corporate tax purposes was specifically deferred by Congressional mandate under Section 112(b) to (e). The law then is established that earnings and profits taken over in a tax-free transfer under Section 112(b) to (e), or other prior laws, are to be treated as earnings and profits of the successor corporation, for but one purpose, namely, that of preventing a tax-free distribution. For all other purposes unless specifically taken over by the successor corporation as its earnings and profits they are neither factually nor legally the earnings and profits of the successor corporation. Obviously, neither the imposition of the excess profits tax nor the computation of invested capital thereunder involves distribution of earnings by the plaintiff taxpayer, nor does it involve any question of preventing the tax-free distribution of earnings. The excess profits tax situation here under consideration has not even the most remote relationship

to a distribution of predecessor corporation's earnings and profits and there is no possible analogy between the two. Since the taxpayer has never treated the earnings and profits of the predecessor as its own earnings and profits, and since the excess profits computation has not the remotest relation to a distribution of earnings, there is not the slightest legal basis for the computation made by the Commissioner of Internal Revenue, and of course, for the deficiency assessment found thereunder.

The second case on which the Commissioner relies, Crossett Western Co. v. Commissioner of Internal Revenue, 3 Cir., 1946, 155 F.2d 433, has the appearance of aptness in that it is addressed to a construction of the same excess profits statutes we are here concerned with. However, an analysis of that opinion and of the findings of fact and conclusions of law made by the Tax Court (4 T.C. 785) reveals that the holding therein was based on stipulated premises which in this case are not only not stipulated to but constitute the fundamental issues. The parties there agreed by stipulation that under the then prevailing (but pre-Phipps rule) construction of the Sansome case, earnings and profits existing prior to merger in the original corporation participating in the merger which formed the Crossett-Western Company were taken by the latter as earnings and profits of Crossett-Western Company in a Section 112 tax-free reorganization. The following excerpts from the Tax Court reports illustrate the nature of the stipulation there involved as one which stipulates to the construction of the law as believed to be expounded in a decision and from that construction of law culminates in a stipulation of facts:

"The earnings and profits of Big Creek Logging Co. which, under the rule of Commissioner [of Internal Revenue] v. Sansome, [2 Cir.,] 60 F.2d 931, became earnings and profits of the petitioner upon transfer of the assets of Big Creek Log-

ging Co. to it, amounted to $792,-902.46." 4 T.C. 785.

\* \* \* \* \* \*

"The earnings and profits of Crossett-Western Lumber Co. which, under the rule of Commissioner [of Internal Revenue] v. Sansome, supra, became earnings and profits of the petitioner upon transfer of the assets of Crossett-Western Lumber Co. to it, amounted to $130,278.05." 4 T.C. 786.

\* \* \* \* \* \*

"The aggregate accumulated earnings and profits of said transferor corporations remaining as of December 31, 1923, the date the reorganization was effected, amounted to $923,180.51, which, under the rule of Commissioner [of Internal Revenue] v. Sansome, supra, became the earnings and profits of the petitioner at the time of its organization." 4 T.C. 786.

\* \* \* \* \* \*

(Under the heading "Opinion"):

"Included in this amount was the sum of $923,180.51 representing the accumulated earnings and profits of the transferor corporations which, under the rule of Commissioner [of Internal Revenue] v. Sansome, supra, became earnings and profits of the petitioner for tax purposes." 4 T.C. 787.

\* \* \* \* \* \*

"It is stipulated that as a result of a nontaxable reorganization the taxpayer took over the assets of other corporations, including accumulated earnings and profits, and under the rule of Commissioner [of Internal Revenue] v. Sansome, supra, these earnings and profits became taxpayer's earnings and profits." 4 T.C. 788.

\* \* \* \* \* \*

(In the Concurring Opinion):

"The earnings and profits of the transferors, under the principle of the Sansome case, become the earn-

ings and profits of the transferee." 4 T.C. 789.

The following excerpts from the Crossett case as it appears in the Federal 2d Reporter, further illustrate the nature of the stipulation, 155 F.2d 434, 435:

"Under Commissioner of Internal Revenue v. Sansome, 2 Cir., 60 F.2d 931, certiorari denied 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575, the earnings and profits of the original corporations, amounting to $923,180.51, became the earnings and profits of the petitioner at the time of the reorganization.[1]

" [1] This is in accordance with the stipulation between the parties, but even aside from that the present facts are squarely under the Sansome doctrine.

" \* \* \* In addition, under Sansome, the accumulated earnings and profits of the original companies are considered part of the accumulated earnings and profits of the functioning company."

It seems clear that the Court of Appeals in the Crossett case did not decide the question presented here where the earnings and profits of a predecessor corporation were not included in the transferee's earnings and profits but were capitalized.

That Court stated at pages 437–438 of 155 F.2d:

"It is also suggested that section 718(b)(3) calls for a deduction only if and when petitioner included its predecessor earnings and profits in the total of accumulated earnings and profits at the beginning of the taxable year. Whatever merit there might be in this argument it is contrary to the stipulated facts and irrelevant in this case where the earnings and the profits of the two antecedent companies, under the Sansome rule, become the petitioner's earnings and profits."

It is our opinion therefore that the Crossett case is not authority for the

position taken by the Commissioner of Internal Revenue.

■■ In one pertinent but not controlling respect, however, the Crossett case must be held authority, and that is in respect to the taxpayer's first argument that the legislative history of Section 718(b) (3) evidences a Congressional intent that the section was included in the code in order to eliminate duplications in the computations of invested capital. While candor requires our admission that to us the legislative history was persuasive evidence that Congress was addressing itself to the specific situation of preventing an overstatement of invested capital resulting from duplicating amounts in the items of earnings and profits and on property paid in, and further intended only clerical and technical changes, we accept the pronouncement of the Court of Appeals in the Crossett case that the language of the statute does not confine the required reduction of equity invested capital to cases where there are or may be duplications. Crossett Western Co. v. Commissioner of Internal Revenue, 2 Cir., 155 F.2d 433, 437. However, since we have found that the plaintiff corporation had no accumulated earnings and profits factually or by operation of law, our holding that (a) and (b) of Section 718 are not limited in their use to cases of actual or possible duplication in respect of equity invested capital has no effect here.

While our holding heretofore made is sufficient for and requires a disposition favorable to the plaintiff, it should be added that we find merit in plaintiff's argument that a policy of corporate tax compatibility requires a ruling in its favor.

We do not see how it can be disputed that the Commissioner's determination that the earnings and profits of predecessor corporations were taxpayer's earnings and profits, although never so treated by it, was in effect to recognize gains, the tax effects of which, Congress has explicitly provided should be deferred. Since the tax-free reorganization law, Section 112, applies equally to gains and losses, what the Supreme Court said in the Phipps case, relative to the premature recognition of losses applies here in a gain case. Commissioner of Internal Revenue v. Phipps, 336 U.S. 410, 421, 69 S.Ct. 616, 93 L.Ed. 771.

"And in the case of a reorganization or liquidation in the framework of the Code, the recognition of loss is deferred by Congressional mandate to a later time." 336 U.S. at page 420, 69 S.Ct. at page 621.

\* \* \* \* \* \*

"Since we believe that to allow deduction from these earnings of the deficits of its subsidiaries would be in effect to recognize losses the tax effects of which Congress has explicitly provided should be deferred, the judgment of the Court of Appeals is reversed." 336 U.S. at page 421, 69 S.Ct. at page 622.

It is worthy of notice that in this case there is no attempt by a taxpayer to circumvent a legitimate tax. The chronological sequence of events alone precludes such a suggestion for the Sansome case was decided in 1932. The merger was accomplished in 1935 and the excess profits tax enacted in 1940. Thus at the time of the merger in 1935, the taxpayer knew that no tax gains to distributees could be gained by the merger as accomplished and beyond a doubt taxpayer could not anticipate the provisions of a tax act legislated five years later. Taxpayer's motive then and at all times since in its treatment and use of the assets paid in at the time of the merger has been properly to reflect the nature and character of its capital structure. We believe that the result we arrive at in this case is completely consistent with the Sansome rule as clarified and limited by Phipps, and with the provisions for the deferred recognition of gains and losses in a tax-free reorganization under Section 112.

At such time in the future as there is a distribution of the earnings and profits

of the predecessor corporations, the Sansome rule will subject them to taxation. Until, however, that time properly arrives, it shall have the benefit of the Congressional mandate that such recognition of gain shall be deferred.

The foregoing opinion shall stand as and for findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Plaintiff is entitled to judgment, and shall be responsible for the preparation of an order for judgment and judgment accordingly. In accordance with Paragraph 9 of the stipulation of facts filed herein, the agreed judgment sum of the refund of taxes to the plaintiff shall be submitted to the Court after the defendant has computed such refund sum and submitted it to the plaintiff for approval.